UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 09-2401
(3:08-cv-03996-MJP)

CARL G. FERRELL, individually and on behalf of all others
similarly situated,

   Plaintiff - Appellee,

  v.

EXPRESS CHECK ADVANCE OF SC LLC,

   Defendant - Appellant,

  and

ADVANCE AMERICA CASH ADVANCE CENTERS OF SOUTH CAROLINA,
INCORPORATED; LOCAL CASH ADVANCE OF SC III LLC; PAYDAY USA
OF SC LLC,

   Defendants.

O R D E R

   The court amends its opinion filed January 8, 2010, as
follows:

   On page 5, last line of text before section II, the
date "December [21]" is corrected to read "December 22" and the
brackets around the number are deleted.

        For the Court – By Direction

        /s/ Patricia S. Connor
          Clerk

**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

CARL G. FERRELL, individually and
on behalf of all others similarly
situated,

            *Plaintiff-Appellee,*

      v.

EXPRESS CHECK ADVANCE OF SC
LLC,

            *Defendant-Appellant,*

      and

ADVANCE AMERICA CASH ADVANCE
CENTERS OF SOUTH CAROLINA,
INCORPORATED; LOCAL CASH
ADVANCE OF SC III LLC; PAYDAY
USA OF SC LLC,

            *Defendants.*

No. 09-2401

Appeal from the United States District Court
for the District of South Carolina, at Columbia.
Matthew J. Perry, Jr., Senior District Judge.
(3:08-cv-03996-MJP)

Argued: October 27, 2009

Decided: January 8, 2010

Before TRAXLER, Chief Judge, and NIEMEYER and
AGEE, Circuit Judges.

Affirmed by published opinion. Judge Niemeyer wrote the opinion, in which Chief Judge Traxler and Judge Agee joined.

## COUNSEL

**ARGUED**: William Clifford Wood, Jr., NELSON, MULLINS, RILEY & SCARBOROUGH, LLP, Columbia, South Carolina, for Appellant. Joseph Camden Wilson, PIERCE, HERNS, SLOAN & MCLEOD, Charleston, South Carolina, for Appellee. **ON BRIEF**: C. Mitchell Brown, NELSON, MULLINS, RILEY & SCARBOROUGH, LLP, Columbia, South Carolina, for Appellant. Alan P. Sloan, III, PIERCE, HERNS, SLOAN & MCLEOD, Charleston, South Carolina, for Appellee.

## OPINION

NIEMEYER, Circuit Judge:

In this appeal, we hold that, for purposes of determining subject matter jurisdiction under the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (codified in scattered sections of Title 28, United States Code), a limited liability company is an "unincorporated association" as that term is used in 28 U.S.C. § 1332(d)(10) and therefore is a citizen of the State under whose laws it is organized and the State where it has its principal place of business.

After Carl Ferrell, a citizen of South Carolina, commenced this class action in South Carolina state court against Express Check Advance of South Carolina, LLC, and others, alleging that their "payday loans" violated South Carolina law, Express Check removed the action to federal court under CAFA, 28 U.S.C. § 1453(b), alleging minimal diversity, as specified in 28 U.S.C. § 1332(d)(2)(A), as the basis for fed-

eral jurisdiction. Express Check contended that the minimal diversity requirement of CAFA was satisfied because all other parties are South Carolina citizens, while it, as a limited liability company, is a citizen of Missouri and Kansas based on the citizenship of its sole member, a Missouri corporation with its principal place of business in Overland, Kansas. Alternatively, it argued that if it was deemed an "unincorporated association" within the meaning of § 1332(d)(10), it is nonetheless a citizen of Tennessee, under whose laws it is organized, and of Kansas, where it has its principal place of business.

On Ferrell's motion to remand, the district court concluded that Express Check, as a limited liability company, is an "unincorporated association" under § 1332(d)(10) and that its principal place of business is in South Carolina, not Kansas. The court accordingly remanded the case to state court for lack of subject matter jurisdiction.

On appeal, we conclude that (1) a limited liability company is an "unincorporated association" as used in § 1332(d)(10), whose citizenship is that of the State under whose laws it is organized and the State where it has its principal place of business, and (2) Express Check has its principal place of business in South Carolina. Accordingly, we affirm.

I

Carl Ferrell commenced this class action in the Richland County Court of Common Pleas, naming four business entities as defendants: Advance America, Cash Advance Centers of South Carolina, Inc.; Local Cash Advance of SC, III, LLC; Payday USA of SC, LLC; and Express Check Advance of South Carolina, LLC. The complaint alleges that, in making payday loans in South Carolina, the defendants violated (1) the South Carolina Deferred Presentment Services Act, in particular S.C. Code Ann. § 34-39-200(5), by engaging in unfair, deceptive, and fraudulent practices; (2) the South Carolina

Consumer Protection Code, in particular S.C. Code Ann. § 37-5-108(1), by engaging in unconscionable conduct; and (3) the South Carolina common-law duties of good faith and fair dealing. The complaint also alleges that defendants acted negligently and engaged in a civil conspiracy. Ferrell, a South Carolina citizen, purports to represent a class of other South Carolina citizens who had entered into payday loans in South Carolina. The parties agree that, other than Express Check, all defendants are also citizens of South Carolina for purposes of diversity jurisdiction.

Express Check is a limited liability company organized under the laws of Tennessee, and its sole member is QC Financial Services, Inc., a Missouri corporation with its principal place of business in Overland, Kansas. All the stock of QC Financial Services is in turn owned by QC Holdings, Inc., a Kansas corporation with its principal place of business in Overland, Kansas. Express Check engages in the business of making payday loans from stores located solely in South Carolina. While its top four officers, who are also officers of QC Financial Services, are located in Kansas, all other Express Check employees are located in South Carolina.

Express Check's operations in South Carolina are substantially controlled by QC Financial Services and QC Holdings. These two corporations make the major operational and policy decisions for Express Check, which then are implemented by Express Check's employees in South Carolina. QC Financial Services and QC Holdings also provide a variety of general support services to Express Check, such as legal, marketing, accounting, auditing, information technology, and collection services.

Invoking federal subject matter jurisdiction based on minimal diversity under 28 U.S.C. § 1332(d)(2)(A), Express Check filed a notice of removal under 28 U.S.C. § 1453(b), contending that it is not a citizen of South Carolina and therefore that the minimal diversity requirement was fulfilled. Fer-

rell filed a motion to remand, claiming that Express Check is a citizen of South Carolina and therefore that the minimal diversity needed for jurisdiction did not exist. The district court granted Ferrell's motion to remand, concluding that Express Check is an "unincorporated association," which, under 28 U.S.C. § 1332(d)(10), is "deemed to be a citizen of the State where it has its principal place of business and the State under whose laws it is organized." Concluding that Express Check has its principal place of business in South Carolina, the court found that it did not have subject matter jurisdiction over the action.

Express Check filed a petition for permission to appeal under 28 U.S.C. § 1453(c), and we granted the petition by order dated December 22, 2009.

## II

Express Check contends that, as a limited liability company, its citizenship for purposes of diversity jurisdiction should be determined under traditional rules by looking to the citizenship of its sole member, QC Financial Services. *See Carden v. Arkoma Assocs.*, 494 U.S. 185 (1990) (holding that a limited partnership is not itself a citizen and that courts must instead look to the citizenship of its members to determine if diversity jurisdiction exists); *Gen. Tech. Applications, Inc. v. Exro Ltda*, 388 F.3d 114, 121 (4th Cir. 2004) (holding that a limited liability company's "citizenship is that of its members"). It argues that CAFA, which, in 28 U.S.C. § 1332(d)(10), changed the traditional rule for determining the citizenship of "unincorporated association[s]" in class actions, does not apply to it because a limited liability company is not an "unincorporated association." It argues that, under Tennessee law, it is an artificial entity created by statute, whose nature falls somewhere between that of a corporation and an unincorporated association. Thus, when applying the traditional rules, it should not be treated as a citizen of South Carolina, but rather as a citizen of Missouri and Kan-

sas, the States of citizenship of its sole member, QC Financial Services. Because the minimal diversity requirement of 28 U.S.C. § 1332(d)(2)(A) is thus satisfied, Express Check argues that it properly removed this action to federal court under 28 U.S.C. § 1453(b) and that the district court erred as a matter of law in concluding otherwise.

Ferrell contends that the term "unincorporated association," as used in § 1332(d)(10), is "very broad and encompasses all non-corporate entities, including limited liability companies." He argues that in § 1332 Congress created two categories, corporations and unincorporated associations, both of which are treated similarly for determining diversity jurisdiction in CAFA class actions, and that federal courts should not rely on the nuances of Tennessee law to make their jurisdictional decisions. *See Carden*, 494 U.S. at 197 (admonishing against delving into such an analysis).

The issue thus presented focuses on the single question of statutory interpretation of whether § 1332(d)(10), which, in the CAFA context, changed the traditional rule for determining the citizenship of unincorporated associations, applies to limited liability companies.

In CAFA, Congress conferred subject matter jurisdiction on federal courts over class actions in which the amount in controversy exceeds $5 million and in which "any member of a class of plaintiffs is a citizen of a State different from any defendant." 28 U.S.C. § 1332(d)(2)(A). The citizenship of a corporation is determined by the State in which it is incorporated and the State in which it has its principal place of business, *see id.* § 1332(c)(1), and the citizenship of an unincorporated association is determined similarly by the State "under whose laws it is organized" and the State where it has its principal place of business, *see id.* § 1332(d)(10). The provisions for determining the citizenship of corporations and of unincorporated associations, however, are contained in separate places in § 1332, reflecting that the provision for

determining the citizenship of unincorporated associations applies only to class actions covered by CAFA. The significance of including a provision for unincorporated associations only in CAFA informs the proper interpretation of the provision, and this is better understood against the background jurisprudence.

In *Marshall v. Baltimore & Ohio Railroad Co.*, 57 U.S. (16 How.) 314, 327-29 (1854), the Supreme Court, noting that corporations technically were not citizens for diversity purposes, held nonetheless that corporations should be deemed citizens of the State where they were incorporated because a corporation's shareholders could conclusively be presumed to be citizens of the incorporating State. By contrast, in a line of cases beginning with *Chapman v. Barney*, 129 U.S. 677 (1889), the Court made clear that artificial entities *other than corporations* are not citizens for diversity purposes and that courts must look to the citizenship of their members when determining whether diversity jurisdiction exists. *Id.* at 682 (holding that a joint stock company "cannot be a *citizen* of New York, within the meaning of the statutes regulating jurisdiction, unless it be a corporation"); *see also Great Southern Fire Proof Hotel Co. v. Jones*, 177 U.S. 449, 456–57 (1900) (refusing to extend the jurisdictional rule for corporations to cover a limited partnership association); *United Steelworkers of America, AFL-CIO v. R.H. Bouligny, Inc.*, 382 U.S. 145, 149-53 (1965) (maintaining the "distinction between the 'personality' and 'citizenship' of corporations and that of labor unions and other unincorporated associations" and accordingly holding that an unincorporated labor union is not a citizen for diversity purposes); *Carden*, 494 U.S. at 194-97 (applying "the trilogy of *Chapman*, *Great Southern*, and *Bouligny*" to hold that a limited partnership is not itself a citizen for diversity purposes).

Referring to this jurisprudence, which applies different rules based on whether the entity in question is incorporated, the Supreme Court has often characterized any business entity

that is not a corporation as an "unincorporated association." *See Bouligny*, 382 U.S. at 149-50; *Carden*, 494 U.S. at 195 ("[I]t is difficult to understand how the dissent can characterize as 'newly formulated' the 'rule that the Court will, without analysis of the particular entity before it, count every member of an unincorporated association for purposes of diversity jurisdiction'"); *Navarro Savings Ass'n v. Lee*, 446 U.S. 458, 461 (1980) ("Although corporations suing in diversity long have been 'deemed' citizens, unincorporated associations remain mere collections of individuals" (internal citation omitted)). Even though the Supreme Court has also referred to unincorporated associations as "artificial entities other than corporations," *Carden*, 494 U.S. at 197, it intended no difference in meaning, and we have recognized that for determining citizenship for diversity jurisdiction, the *Chapman* line of cases established a categorical rule governing all "unincorporated associations." *N.Y. State Teachers Retirement Sys. v. Kalkus*, 764 F.2d 1015, 1017 (4th Cir. 1985) ("[T]he Supreme Court has consistently held that in diversity actions involving *unincorporated associations*, federal courts must look to the citizenship of each member of the association to determine whether diversity exists" (emphasis added)); *see also Clephas v. Fagelson, Shonberger, Payne & Arthur*, 719 F.2d 92, 93 (4th Cir. 1983) ("It is hornbook law that '*[u]nincorporated associations* have never been accorded a status as jural persons for purposes of diversity jurisdiction, nor has there developed a presumption of a single citizenship of the members'" (emphasis added) (quoting Henry M. Hart, Jr. & Herbert Wechsler, *The Federal Courts and the Federal System* 917 (1st ed. 1953))); *Belle View Apartments v. Realty ReFund Trust*, 602 F.2d 668, 669 (4th Cir. 1979) ("Although the holding of *Bouligny* was technically limited to labor unions, 'every argument advanced by the Court is applicable to all forms of *unincorporated associations*'" (emphasis added) (quoting 13 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3630, at 849 (1st ed. 1975))); 13F Wright, Miller & Cooper, *supra*, § 3630

(3d ed. 2009) (addressing the applicable legal landscape in a section entitled, "Unincorporated Associations—History of General Principle"); Walter W. Jones, Jr., Annotation, *Determination of Citizenship of Unincorporated Associations, For Federal Diversity of Citizenship Purposes, In Actions By or Against Such Associations*, 14 A.L.R. Fed. 849 (2004), *cited in* S. Rep. No. 109-14, at 46 (2005), *reprinted in* 2005 U.S.C.C.A.N. 3, 43.

Thus, under the traditional jurisprudence, corporations were deemed to be citizens of the State in which they were incorporated, and all other business enterprises were referred to as unincorporated associations and treated effectively as citizens of the States of which their members were citizens. In 1958, Congress enacted § 1332(c) to modify the traditional rule with respect to corporations by expanding the citizenship of a corporation to include not only the State of incorporation but also the State where it has its principal place of business. But no similar provision was made for unincorporated associations, which remained governed by the *Chapman* line of cases. While the Supreme Court in both *Bouligny* and *Carden* recognized that the incorporated/unincorporated dichotomy was "unresponsive to policy considerations raised by the changing realities of business organization," it noted that Congress was better positioned to make the appropriate accommodations. *Carden*, 494 U.S. at 196–97; *Bouligny*, 382 U.S. at 149–51. And in enacting § 1332(d)(10) as a part of CAFA in 2005, Congress accepted the Court's invitation, modifying the rule for business entities other than corporations to provide, for purposes of CAFA, that the citizenship of all "unincorporated association[s]" is determined by the State under whose laws the unincorporated association is organized and the State where it has its principal place of business. *See* 28 U.S.C. § 1332(d)(10).

Given this history, we read § 1332(d)(10) to respond to the categorical distinction that the Supreme Court created in *Chapman* and maintained in *Bouligny* and *Carden*. Moreover,

the specific language of § 1332(d)(10) indicates that a limited liability company, if *not a corporation*, is an *unincorporated* association, employing "unincorporated" as the counterpart to "incorporated." *See Gen. Tech. Applications*, 388 F.3d at 121 ("[A limited liability company] is an unincorporated association, akin to a partnership for diversity purposes").

Accordingly, we agree with the district court that, under § 1332(d)(10), Express Check's citizenship for purposes of CAFA is that of the State under whose laws it is organized and the State where it has its principal place of business.

To argue that Congress intended "unincorporated association" in § 1332(d)(10) to refer to only those non-corporate entities that lack a distinct legal identity under the law of the State in which they are organized, Express Check compares the language of § 1332(d)(10) (referring to "unincorporated association") with the language in §§ 1332(d)(9)(B) and 1453(d)(2) (referring to "a corporation or other form of business enterprise"). Relying on the canon of statutory construction that, in general, different words used in the same statute should be assigned different meanings, Express Check reasons that Congress must have intended these two phrases to have different meanings. Moreover, it argues that the phrase "other form of business enterprise" should be read naturally as the broader of the two, connected to "corporation" by the disjunctive "or," and that therefore "other form of business enterprise" was the term that Congress employed when it wanted to refer to all non-corporate entities. Thus, it reasons, the term "unincorporated association" in § 1332(d)(10) refers to only a narrower subset of non-corporate business forms, a class that excludes entities having a distinct legal identity under the law of the State in which they are organized.

This argument overlooks two linguistic restraints imposed by the plain language of the statute. First, the use of "a corporation or other form of business enterprise" in §§ 1332(d)(9)(B) and 1453(d)(2) refers to the class of *all*

business entities for the purpose of excluding from CAFA disputes over their internal affairs and governance. As Express Check appropriately recognizes, "business enterprise" is a broader term than either "corporation" or "unincorporated association." Congress undoubtedly intended the exception in §§ 1339(d)(9)(B) and 1453(d)(2) to apply to *all* business forms, whether they be corporations or unincorporated associations. By using "or other" ("a corporation *or other* form of business enterprise"), Congress included "corporation" as an example form of "business enterprise," so that the term "business enterprise" itself *includes both* "corporations" and any other form of business enterprise. Thus, "business enterprise" was the broadest term Congress could use, and this class includes corporations and non-corporate entities. When using "unincorporated association" in § 1332(d)(10), therefore, Congress needed to use a term narrower than "business enterprise," because the term "business enterprise" also includes corporations. In essence, by using "business enterprise," "corporation," and "unincorporated association" as it did, Congress used "business enterprise" as the broadest term and subdivided the entities covered by that term, as needed, into two subclasses, corporations and non-corporate entities, referring to the latter subclass as "unincorporated association[s]."

Second, the phrase "*unincorporated* association" distinguishes itself linguistically from *incorporated* associations, thereby suggesting two mutually exclusive classes of business enterprises -– those that are incorporated, *i.e.*, corporations, and those that are not.

Moreover, Express Check's argument overlooks the developmental history of § 1332. In 1958, in response to *Marshall*, 57 U.S. (16 How.) at 327-29, where the Supreme Court defined in effect the citizenship of a corporation as determined by only its State of incorporation, Congress statutorily expanded that holding to provide that the citizenship of the corporation is also determined by the State where it has its principal place of business. At that time, it left all other busi-

ness enterprises subject to the traditional rule of looking to the citizenship of members, as provided in *Chapman*, 129 U.S. at 682, and its progeny. But in 2005, in order to give CAFA broad application, Congress defined the citizenship of those other business enterprises narrowly, *i.e.*, limiting their citizenship to one or two States—where they were organized and where they had their principal place of business—and thus facilitating federal court jurisdiction over CAFA class actions.

Accordingly, we reject Express Check's linguistic argument.

Express Check also makes an argument that "unincorporated association" as used in § 1332(d)(10) is limited to only entities that lack a distinct legal identity based on some language contained in *Navarro*. Lifting isolated phrases from *Navarro*, it argues that "unincorporated associations" are "mere collections of individuals." 446 U.S. at 461. And because a limited liability company organized under Tennessee law is "a legal entity distinct from its members," Tenn. Code Ann. § 48-249-116, it is thus more than a "mere collection[ ] of individuals." *Navarro*, however, did not define or even describe "unincorporated associations" as "mere collections of individuals." Rather, the language lifted by Express Check from *Navarro* was simply *Navarro*'s restatement of *Chapman*'s rule that, for diversity purposes, "unincorporated associations *remain* mere collections of individuals," even though corporations are deemed citizens. *Navarro*, 446 U.S. at 461 (emphasis added).

In sum, we conclude that the term "unincorporated association" in § 1332(d)(10) refers to all non-corporate business entities. This interpretation not only serves the language and history of § 1332 but also the purpose of broadening the reach of CAFA. Thus, a limited liability company, such as Express Check, is an "unincorporated association" within the meaning of § 1332(d)(10).

## III

That still leaves the question of where Express Check has its principal place of business. Express Check contends that because its operations, even though conducted in South Carolina, are controlled by officers in Kansas, Kansas should be found to be its principal place of business, thus establishing it as a Kansas citizen, as well as a citizen of Tennessee under whose laws it is organized.

Ferrell, on the other hand, contends that Express Check's principal place of business is in South Carolina because all of its business operations are conducted there. It makes payday loans only in South Carolina from locations only in South Carolina through its employees, all of whom function in South Carolina, except for its top four officers, who are also among the top officers of QC Financial Services and who function in Overland, Kansas.

We have recognized two tests for determining a business' principal place of business: the "nerve center" test, which makes determinative the home office or place where the corporation's officers direct, control, and coordinate its activities, and the "place of operations" test, which makes determinative the place where the bulk of corporate activity takes place. *See Peterson v. Cooley*, 142 F.3d 181, 184 (4th Cir. 1998) (quoting *Mullins v. Beatrice Pocahontas Co.*, 489 F.2d 260, 262 (4th Cir. 1974) (per curiam)). Although these tests were developed in the context of ascertaining a *corporation's* principal place of business under § 1332(c)(1), we conclude that it is logical to apply the same tests when determining an unincorporated association's principal place of business under § 1332(d)(10). *See Davis v. HSBC Bank Nevada, N.A.*, 557 F.3d 1026, 1032 n.16 (9th Cir. 2009) (Kleinfeld, J., concurring) ("We apply the same tests to determine the 'principal place of business' for corporations and unincorporated associations").

Although we have not endorsed either test to the exclusion of the other and have noted that both tests need not be applied in any given case, we have recognized that the nature of the business involved determines best which test is the more appropriate to apply. Thus, in *Peterson*, we explained that the place of operations test, which "presumes the existence of physical operations by which a corporation's presence in different states can be measured," is "applied when a company has multiple centers of manufacturing, purchasing, or sales." 142 F.3d at 184. But when, for example, a company "engag[s] primarily in the ownership and management of investment assets such as debt or equities," so that it "is not really geographically bound," we apply the nerve center test. *Id.*; *see also Athena Auto., Inc. v. Digregorio*, 166 F.3d 288, 290 (4th Cir. 1999).*

The nature of Express Check's business, simply put, is to make payday loans from its numerous store locations in South Carolina, where all of its employees, except four officers, also work. We conclude that when a company has all of its physical operations for doing business in a given State and its four top officers in another, the place of operations test should be applied to most accurately reflect its principal place of business. In this case, that is South Carolina.

Express Check's primary challenge to this conclusion is that we should attribute to it the citizenship of its parent companies because they exercise complete control over it. Express Check argues that it is merely the alter ego of its sole member, QC Financial Services, and QC Financial Services' parent, QC Holdings. Thus, it concludes that the citizenship of those companies—Missouri and Kansas—should be imputed

---

*Resolving the simply stated question of where a business entity has its principal place of business is not a simple matter, and the circuit courts have developed different tests. In June 2009, the Supreme Court granted certiorari in *Hertz Corp. v. Friend*, 129 S. Ct. 2766, to resolve the split, and that case was argued in November 2009.

to it. In the circumstances of this case, we reject that argument.

Express Check's corporate parents decided to maintain it as a legally separate entity and have undoubtedly benefited from this arrangement. It may not now complain that it would improperly elevate form over substance for us to respect the very corporate structure its parents selected. *See J.A. Olson Co. v. City of Winona*, 818 F.2d 401, 414 (5th Cir. 1987) ("We hold then that the alter ego doctrine may not be used to create diversity jurisdiction by ignoring the principal place of business of a subsidiary corporation and imputing to it the principal place of business of the parent").

In sum, because Express Check has its principal place of business in South Carolina, it is a citizen of South Carolina for purposes of diversity jurisdiction under CAFA. 28 U.S.C. § 1332(d)(10). Accordingly, it has not carried its burden of demonstrating that minimal diversity as defined in § 1332(d)(2)(A) exists. *See Johnson v. Advance America, Cash Advance Ctrs. of S.C., Inc.*, 549 F.3d 932, 936 (4th Cir. 2008); *Strawn v. AT&T Mobility LLC*, 530 F.3d 293, 298 (4th Cir. 2008).

The order remanding this case to state court is accordingly

*AFFIRMED*.